# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 8, 2012

## STATE OF TENNESSEE v. BRIAN LE HURST

**Appeal from the Criminal Court for Davidson County**
**No. 2008C2864    Steve R. Dozier, Judge**

**No. M2010-01870-CCA-R3-CD - Filed December 20, 2012**

Defendant was convicted of first degree (premeditated) murder after a trial by jury. He was sentenced to life in prison. On appeal, the defendant claims that the evidence is insufficient to support his conviction. The defendant also claims that the trial court erred by admitting three pieces of evidence: (1) an excerpt from a 911 call made by the victim several days before his death, in which the victim claimed to be "a little . . . concerned" about the defendant's behavior; (2) testimony from one of the defendant's friends to the effect that the friend did not believe that any affair had occurred between the defendant and the friend's then-wife; and (3) testimony concerning various searches performed on the defendant's computer involving the name "Missy." Finally, the defendant claims that the trial court erred by granting the State's request for a special jury instruction concerning the destruction of evidence. After review, we conclude that the evidence is sufficient to support the defendant's conviction and that the trial court did not err with respect to the evidentiary and jury instruction claims raised by the defendant. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JEFFERY S. BIVINS, J., joined. JAMES CURWOOD WITT, JR.., J,. filed a concurring opinion.

Dawn Deaner, District Public Defender; Emma Rae Tennent (on appeal) and Jason Gichener and Chase Smith (at trial), Assistant Public Defenders; for the appellant, Brian Le Hurst.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Rachel Sombrero, Pamela Anderson, and Rachel Thoms, Assistant District Attorneys General; for the appellee, State of Tennessee.

## OPINION

## FACTS AND PROCEDURAL HISTORY

On June 23, 2008, the defendant, Brian Le Hurst, shot and killed the victim, Eddie Dean Evans. On September 12, 2008, the defendant was indicted on one count of first degree (premeditated) murder in violation of Tennessee Code Annotated section 39-13-202. At his trial on June 7-10, 2010, the State presented the testimony of sixteen witnesses.

Ms. Sybil Skains, the victim's mother, testified that the victim was thirty-seven years old, worked as a manager for Red Robin restaurants, and had a daughter. She identified a picture of the victim, which was entered into evidence without objection from the defendant.

Officer Jason Robert Spencer of the Metropolitan Nashville Police Department testified that he was working patrol on June 23, 2008, and he responded to a call concerning a possible dead body at an apartment complex at 6:08 a.m. He was the first officer on the scene. When he arrived, he was flagged down by an individual and directed to the back of one of the buildings. When he walked around to the back, he saw the victim lying on the ground, apparently deceased due to "a devastating gunshot wound to the head." He testified that he reported a possible homicide to dispatch and secured the area. While on the stand, he was shown numerous photographs of the crime scene, which he authenticated and which were entered into evidence.

Mr. Brad Corcoran testified that he was recently retired from the Metropolitan Nashville Police Department. He testified that on June 23, 2008, he was working in the homicide unit, and he had twenty-four years of total law enforcement experience. He testified that on that date he responded to a crime scene at a specific address on South Oak Drive in Davidson County. He testified that the crime scene had already been secured when he arrived at the location at approximately 6:55 a.m. He testified that the victim's vehicle was discovered in the apartment complex's parking lot, and blood stain patterns were also found in that area. He testified that the victim's body was found at the end of a blood trail. The victim was found lying on his back with his arms extended outward. He testified that the victim was wearing a white "Red Robin" pullover shirt that was saturated with blood. Mr. Corcoran testified that no weapons or shell casings were found on the scene or in the victim's apartment.

Mr. Corcoran testified in detail concerning the investigation that followed. He testified that he interviewed numerous individuals including a Ms. Jessica Scott, and as a result of these interviews, he began to focus his attention on the defendant (whom he identified in open court). Mr. Corcoran testified that he had considerable difficulty locating the defendant following the shooting. The defendant was not at his home or at his place of employment. After speaking with the defendant's pastor, mother, and aunt, Mr. Corcoran

eventually learned that the defendant was at his mother's house. When he arrived at that location, he found the defendant sitting on the front porch being treated by emergency service personnel. He testified that he examined the defendant while he was being treated and determined that the defendant was not physically injured. Mr. Corcoran testified that the defendant was eventually taken into custody for an emergency psychological evaluation after emergency service personnel were informed that he may have ingested pills. Afterward, he was processed and booked.

Mr. Corcoran testified that pursuant to search warrants he (1) impounded the defendant's vehicle, a red Jeep Cherokee, and had it searched; (2) took a deoxyribonucleic acid (DNA) swab from the defendant; (3) searched the defendant's home, where three business cards for gun and ammunition-related businesses were discovered, as well as a notebook containing writings signed by "Jess" or other names similar to Jessica Scott;[1] (4) seized and searched the defendant's computer; and (5) seized and searched the defendant's cell phone. The witness testified that no firearms or ammunition were ever found during any of the searches.

Mr. Corcoran testified that he attended the victim's autopsy and witnessed a bullet being removed from the victim's neck. He identified this bullet, and it was entered into evidence, along with a "blood standard"—a sample of the victim's blood taken for DNA testing purposes. He also took a swab from a bite mark found on the victim's arm.

Mr. Corcoran testified that he subpoenaed the phone records of Ms. Scott and the defendant, who shared a common cell phone plan. He identified these records, which were entered into evidence. The witness testified that the defendant's cell phone records revealed that the defendant called Ms. Scott at 10:03 p.m. on June 22, 2008, and made no further calls until 5:51 a.m. on June 23, 2008. The records also revealed that the defendant called his mother eight times between 5:52 a.m. and 6:46 a.m. that morning.

On cross-examination, Mr. Corcoran testified that when he initially surveyed the crime scene he concluded, based on the amount of blood he saw, that a struggle happened in the front parking lot directly in front of the victim's truck. He testified that he followed a blood trail from the front to the back of the victim's building. Mr. Corcoran testified that there were no bullets recovered from the crime scene. He also testified that he had no knowledge concerning the caliber of the bullet that was removed from the victim's body.

Mr. Corcoran testified that as part of his investigation, he contacted all three gun

---

[1] Mr. Corcoran testified that he showed this notebook to Ms. Jessica Scott, who informed him that she had not written the notes and that they appeared to be in the defendant's handwriting.

businesses whose names were on the business cards found in the defendant's apartment. He testified that he did not gain any information relevant to the defendant from any of those businesses. Mr. Corcoran also testified that nothing of interest was found on the defendant's cell phone.

Ms. Jessica Scott testified that she was the defendant's ex-girlfriend and identified him in open court. She testified that she was in a relationship with the defendant "[o]n and off for about eight years." She testified that in the early part of 2008 she was living with the defendant, and they were engaged. She testified that the defendant moved out at the end of January or beginning of February and that their engagement was broken off. She testified that they continued to talk and see each other on occasion; "essentially we were still in a relationship but we weren't claiming to be boyfriend and girlfriend at the time." She testified that she and the defendant were engaged on several occasions during their relationship, and they had been engaged for several months on this particular occasion. She testified that she shared a laptop computer and a cell phone plan with the defendant. She also testified that the defendant owned a small black handgun while they were living together.

Ms. Scott testified that after the defendant moved out, she talked with him often, went over to his place and hung out with him on several occasions, and went out on his boat with him. She also testified that she told the defendant that she was not "in love" with him anymore. However, she called him on occasion to "help . . . with things around the house" because she "may have needed him."

Ms. Scott testified that she first met the victim in April of 2008, when they "opened the Red Robin in Hendersonville together." She testified that she worked at that location as a bartender and that, at one point, the victim gave his phone number to her. Ms. Scott testified that when she was informed that the victim was being transferred to another Red Robin location (in Mount Juliet), she called him and invited him to "grab a drink," and they did so. Ms. Scott testified that the following day, she called the defendant and told him that she had met someone and "wanted to pursue something with him." She testified that the defendant argued with her and told her that he was not going to lose her.

Ms. Scott testified that over the next several weeks she casually dated the victim. She testified that she continued to talk to the defendant. She testified that she informed the defendant when she talked to the victim, and vice versa. She testified that she continued to see the defendant, and at one point she asked him to come over and stain her deck, and he did so.

Ms. Scott testified that sometime later, she went over to the defendant's house and had sex with him. Afterward, she told the defendant that it would never happen again. The next

day, she met with the victim and pressed him about the status of their relationship. She testified that she and the victim agreed to date each other exclusively. She testified that she stopped inviting the defendant over to her house at this point.

Ms. Scott testified that she took some steps to keep the defendant separated from the victim. She testified that she never brought the victim over to her residence in an effort to avoid a possible confrontation. She also parked her car at different locations around the victim's apartment complex in an effort to keep the defendant from knowing that she was there.

Ms. Scott testified that, these efforts notwithstanding, the defendant did meet the victim on one occasion. On that day she, her sister, the victim, and their children all went to the zoo. According to Ms. Scott, the defendant "showed up at some point during the day covered in sweat," introduced himself, shook the victim's hand, and stated that he "just thought [he] would come and join [us] and spend the rest of the day with [us] all." Ms. Scott testified that she was shocked by the defendant's behavior. She testified that the defendant explained to her that he was sweaty because "[h]e had been running all over the zoo trying to find us." Eventually, her sister told the defendant to leave, and he did so.

Ms. Scott testified that following the incident at the zoo she saw the defendant unexpectedly on several additional occasions. She testified that a few weeks before the shooting, she had begun spending the night with the victim three or four nights a week, and she would come home to find the defendant outside her house waiting for her on almost every such occasion. She even discovered the defendant inside of her residence on some occasions, after he apparently gained access using keys that he had copied during the time when they were dating. Ms. Scott testified that although she had an alarm on the residence, which had been given to her by the defendant, she never changed the alarm code following any of these incidents.

Ms. Scott testified that on June 5, 2008, she returned home after spending the night with the victim to discover messages on her phone informing her that something was wrong with the defendant. She went to a local hospital and saw the defendant's mother outside. The defendant came out and informed her that he had been having thoughts about killing the victim. The defendant told her that he "need[ed] to go talk to somebody" and that he was seeking help. She testified that this was the first time that she had heard the defendant express thoughts of violence towards the victim. She testified that she believed that the defendant made these statements in an attempt to win her back. She testified that she did not tell the victim about the defendant's statements.

Ms. Scott testified that although she was concerned for and continued to care about

the defendant's well-being, she left. She testified that when she returned to the "crisis center" several hours later to check on him, the defendant was standing outside. He asked her for a ride, and she took him home. She testified that although she did not initiate any conversations with the defendant during the following weeks, she would occasionally take his calls.

Ms. Scott testified that on the morning of June 22, 2008, she returned home around 11:30 a.m. after spending the night with the victim. She walked in her door and discovered the defendant standing at the bottom of her stairs. She testified that the defendant was very emotional, and he begged her to talk with him and to quit talking to the victim. The witness testified that the defendant told her that the victim was getting in the way and that if she would just quit talking to the victim, they would be able to "work this out." She testified that she told the defendant that the victim was not "in the way" and that she was pursuing the victim. She testified that she told the defendant that she did not have time for further discussion because she had to go to work, and she stepped into the shower hoping that the defendant would leave. The defendant agreed to leave if she would talk with him one more time. She agreed.

Ms. Scott testified that she saw the defendant again that day sometime after 4:30 p.m. The defendant arrived at her house bearing "letters that he had written to me" and "a bunch of old pictures of us together." She testified that she allowed the defendant to show her the pictures and to read to her from these materials. When he was finished, she told him "it doesn't matter" and that she no longer wanted to have anything to do with him. She testified that the defendant became extremely upset. She testified that she picked up all of the materials that he had brought with him and threw them into the vehicle that he was driving. The defendant left but returned a short time later to discover her crying. They went back outside again and continued their discussion to the point that it attracted the attention of the neighbors. The defendant finally left a second time.

Ms. Scott testified that as result of the day's events, she decided to change her alarm code. She called the defendant later that day and informed him that if he returned to her residence, the police would arrest him and that she would not intervene. She testified that the defendant asked her if she was telling him that she wanted him completely out of her life, but she told the defendant that she did not. She told the defendant that they would still see each other on occasion, but that she was moving on. She testified that the defendant was very upset.

Ms. Scott testified that on the morning of June 23, 2008, she came into contact with Detective Brad Corcoran of the Metropolitan Nashville Police Department. She testified that she told Detective Corcoran that there had been problems between her and the defendant and

that she and the victim had been dating. During this conversation she was informed that the victim had died. She testified that later that day, she called the defendant, after she was informed that the defendant had claimed that he would not divulge his location until after he talked to her. During this conversation, the defendant informed her that he had heard about the victim's death on the radio, and he was afraid that the police were coming to get him. She testified that the defendant told her that he had not shot the victim. Ms. Scott testified that the defendant attempted to speak with her several additional times after June 23, 2008.

Ms. Scott testified that during his investigation, Detective Corcoran showed her a notepad. She testified that the letter written inside was written in the defendant's handwriting. At the prosecutor's request, she read the letter aloud to the jury:

> Dean, you have been great, sweet, awesome and I care for you but Brian and I have shared eight years. I have never seen him like this and I can't take it. He has reminded me of feelings I didn't know we still—were still there. Even though I'm not in love with him, I do love him. I don't know what I believe and I am also scared of getting hurt but even though I don't want him right now, I'm going to try and give him this chance simply because of the love he has for me and the love I had for him in the past. I don't expect you to wait for me and you will also be special to me but I am going to do this for him. I hope you understand and know that the only way to give this a fair shot means . . . .

The witness testified that a portion of the paper was torn out, but the letter continued several pages later, stating: "you and I can't talk anymore. I am sorry for hurting you and maybe I shouldn't have let things move so fast after just coming out of a relationship. Please understand and forgive me, Jess." The witness testified that she did not write that letter and never said anything like that to the defendant.

On cross-examination, the witness testified that she had no memory of ever seeing the letter that she had just read at any point before the start of the investigation. Ms. Scott testified that she and the defendant had numerous friends in common and went to church together. She testified that for eight years, she was a big part of the defendant's life and the defendant was a big part of her life.

Ms. Scott testified that the defendant moved out of their shared residence because she did not want him living there anymore. She testified that the defendant wanted to continue their relationship after he moved out, and during this time they saw each other socially with mutual friends and took trips together to a lake. She also testified that they were still sleeping together during this time period.

Ms. Scott testified that her relationship with the defendant stopped on May 11, 2008, the day after she went on her first date with the victim. She testified that she only slept with the defendant one time after she started dating the victim. The witness acknowledged that she and the defendant attended church together until the time of the shooting. She also acknowledged that she called the defendant over to her house on several occasions after she started dating the victim to perform chores for her. When asked why she would engage in all of these activities with a man she knew was desperate to win her back, the witness explained her behavior by claiming that the defendant had admitted to her that he had slept with another girl.

Ms. Scott testified that the defendant was upset when he learned that she had gone on a date with someone else, and he became more upset as the situation continued. She testified that the defendant's behavior was strange for him. She testified that the defendant had been jealous throughout their relationship, but he was acting particularly desperate on the day he met her at the zoo. She testified that the defendant told her repeatedly that the victim was not the right person for her. Ms. Scott testified that the defendant informed her that the victim had been married in the past and was cheating on her.

Ms. Scott testified that during her conversations with the defendant on June 22, 2008, the defendant was crying and upset. She testified that he was very emotional when he left her house, and he was "acting pretty desperate."

On redirect examination, Ms. Scott testified that the defendant acted in a jealous manner throughout their entire relationship, and she was not surprised that he behaved in a jealous manner when he found out she was dating the victim. Ms. Scott also testified that the defendant had admitted to her that he had learned that she was going to be at the zoo on the day that he met her there because he had gone through her cell phone and seen her plans. Ms. Scott testified that on June 22, 2008, when she called the defendant and told him about changing her alarm code, the defendant was not crying, but he was angry.

Next, Officer Johnny Lawrence of the Metropolitan Nashville Police Department testified that he worked in the department's identification division and that he was called to a crime scene at 6:15 a.m. on June 23, 2008. He testified that he photographed and diagramed the crime scene, and he authenticated numerous pictures and diagrams which were entered into evidence. He testified that during his investigation, he discovered blood on several vehicles located in the parking lot of the apartment complex and a trail of blood leading to where the victim's body was discovered. Officer Lawrence also testified that he searched the defendant's vehicle, a red 1999 Jeep Cherokee, during his investigation and found a picture depicting the defendant and Ms. Scott posing together as a couple in the glove compartment, which was entered into evidence.

On cross-examination, Officer Lawrence testified that the blood trail he found at the crime scene started at one area of the parking lot and ran between two vehicles and into a grassy area before leading to the back of the apartment building. He testified that the blood trail was sporadic, as if "someone was walking here, walking there, moving here, and going up to the edge of the patios in the back" of the apartment building. Officer Lawrence testified that there was a blood "swipe" discovered on the victim's truck that could have been caused by a hand, clothes, or hair with blood on it sweeping across the object. Officer Lawrence testified that he did not discover any blood when he visually inspected the defendant's jeep, and he did not perform any chemical tests to determine if blood was present.

Officer Tim Matthews of the Metropolitan Nashville Police Department testified that he helped process the crime scene by taking photographs of the victim's body. He authenticated these photographs and some of them were entered into evidence. He also testified that he took a DNA swab of a bite mark found on the victim's right forearm. On cross-examination, Officer Matthews testified that no bullets were recovered from the crime scene. He testified that although he saw markings that he initially believed were bullet holes in the side of a nearby apartment building, he later determined that these markings were not caused by bullets because they were not penetrating holes. He also testified that he performed a chemical test for blood on the defendant's jeep and determined that none was present.

Mr. David Kline, a manager of the city planning department, testified that he often prepared aerial photographic maps at the request of various attorneys. He testified that he had prepared a map and an aerial photograph of a specific address on South Oaks Drive in Davidson County at the request of prosecutors, which he identified and which were entered into evidence. While he was on the stand, he also identified on the map a specific address on Roberta Drive, which he testified was in Hendersonville (outside of Davidson County); and a specific address on Mount Juliet Road, which he testified was in Mount Juliet (also outside of Davidson County). On cross-examination, he testified that the aerial photograph was taken in 2008.

Mr. Craig Calvert, an assistant general manager at the Mount Juliet Red Robin restaurant, testified that the victim was a kitchen manager for Red Robin restaurants. He testified that on June 23, 2008, both he and the victim were scheduled to work at 5:00 a.m. Shortly after midnight that day, he called the victim to let him know he would not be coming in to work later that morning because his father was in the hospital. He testified that at 4:30 a.m. on that day, he called the victim and spoke with him, informing him that his father had just passed away and that he definitely would not be in to work. He testified that the victim was getting ready for work when he spoke with him the second time.

Ms. Shawn Snowdon, who lived at an address on North Oaks Drive at the same apartment complex as the victim, testified that she woke up from a nightmare at 4:30 a.m. on June 23, 2008, and went out to her balcony to do some writing. She testified that shortly before 5:00 a.m., she heard an argument in the parking lot between her building and the next one, which were separated by a forest. Shortly afterward, she "heard one or two pop noises" which she initially believed were fireworks. However, she made a note on her paper stating "one or two shots 5:03." She testified that she was certain of the time because she read it off of a large digital "Budweiser" clock that was set to her cell phone time. She testified that she heard two or three shots "a minute or two later," and also wrote those down. She testified that she heard another three to four shots at 5:07 a.m., and after that she heard nothing but silence. She testified that she heard six to nine shots in all.

Ms. Snowdon testified that the gunshots and the two arguing voices came from the other side of the forest. She testified that she had written all of this information down because she "just had this gut feeling like that it might be important." She also testified that she heard a "pa-choon" sound that morning, like a ricochette hitting the bark of one of the trees.

On cross-examination, Ms. Snowdon testified that her balcony was facing the building where the shooting occurred. She testified that she could tell where the argument was occurring from because the voices were facing her. She testified that she was not sure whether the voices at issue were male or female. She estimated that the argument that she heard lasted about thirty seconds. She testified that she was not sure that the popping noises she heard were gunshots when she first heard them. She testified that she did not initially call the police because she "was in denial." She testified that she did not see anyone run away or any car speed off that morning. Before leaving the stand, the witness indicated on the aerial map of the apartment complex where her unit was located as well as the location of the nearby forest.

Dr. Tom Deering, an expert in forensic pathology, testified that he had reviewed a medical report prepared by Dr. Stacy Turner, who had performed an autopsy on the victim but had since moved out of state. Dr. Deering testified that the report described the victim as having four gunshot wounds to the head and neck. The report also described an apparent bite mark on the victim's forearm and some small abrasions on the victim's skin. The witness identified these wounds on various photographs that were shown to him on the stand, and these photographs were entered into evidence. Dr. Deering testified that the abrasions on the victim's knees appeared to be fresh because the skin had not yet started to seal over. He opined that the bite mark was probably inflicted while the victim was still alive based on the nature of the bruise pattern that was evident in the photographs.

Dr. Deering testified that the victim had one gunshot wound to the left back of his head, which traveled through his brain and exited his cheek. He testified that in his opinion this was the wound that "puts [the victim] to the ground" and that after it was inflicted the victim would not have been conscious. In his expert opinion, Dr. Deering testified this wound was inflicted in the location where the victim's body was discovered, and it would have been fatal by itself.

Dr. Deering testified that the victim had an additional gunshot wound that entered the back left side of his neck and exited the right side of his neck. The witness testified that this wound had "stipple marks" or "gunpowder tattooing" around the entrance, which indicated that the wound had been inflicted by a gun that was somewhere between six inches and two feet away from the victim's body when it was fired. He opined that this wound may have been inflicted in the parking lot and would have been painful but not fatal by itself.

Dr. Deering testified that the victim had a third gunshot wound to the right side of his jaw, with the bullet ultimately lodging in the victim's neck. Dr. Deering testified that this wound had both gunpowder tattooing and soot around the entrance, meaning that it had been inflicted from a distance of less than six inches, and in the witness's expert opinion, the barrel of the gun was probably touching the victim's skin. Dr. Deering further testified that this wound would have caused an extensive amount of blood to come out of the victim's mouth, and it was the only wound that could have caused the blood that was found on the victim's shirt. Dr. Deering opined based on the blood splatter found on the victim's body that he was standing upright when he was hit by this bullet. After reviewing photographs of the crime scene, Dr. Deering testified that, in his opinion, the bleeding caused by this wound created the blood trail leading from the front of the victim's apartment building to the rear. He opined that this wound was inflicted in the front of the building in the parking lot and that it could potentially have been fatal standing alone.

Dr. Deering testified that the victim's final gunshot wound was a grazing wound to the right side of the victim's neck. The lack of stippling on this wound indicated that it had been inflicted from a distance of more than two feet. He also testified that this wound would not have been fatal, and it would have been possible for the victim to have been hit by this bullet and still remain mobile. He opined that it could have been inflicted in the parking lot or anywhere along the blood trail.

The witness identified each of these four wounds on numerous photographs that were provided to him, which were entered into evidence. In conclusion, Dr. Deering testified that in his expert opinion, the victim died as a result of multiple gunshot wounds to the head and neck and that his death was a homicide.

On cross-examination, Dr. Deering testified that the bullet trajectory analysis that he performed when he was examining the victim's body would not allow him to determine the position of the shooter *vis-a-vis* the victim, although he could determine how far the victim had been from the gun when it was fired with respect to some of the wounds. Dr. Deering testified that gunshot residue tests had been performed on the victim's hands, and the swabs had been turned over to the police department. On re-direct examination, Dr. Deering testified that any person standing near where a gun had been fired could have gunshot residue on his skin. He testified that it would not have been unusual for the victim to have had gunshot residue on him because he was shot at close range.

Mr. Mark Dunlop, a forensic scientist at the Tennessee Bureau of Investigation ("TBI") and the State's expert in serology and DNA analysis, testified concerning the steps taken by the TBI to keep various pieces of evidence secure as well as chain of custody issues. He testified that he performed DNA analysis on a swab represented to him as coming from a bite mark discovered on the victim's arm and determined that the sample was a mixed profile, with the victim as a "major contributor" and the defendant as a "minor contributor." He testified that his tests revealed that the probability that the minor contributor was someone other than the defendant exceeded the population of the world by almost six thousand times. He testified that his tests confirmed the presence of saliva in the sample.

Mr. Carter Wamp, the property manager of the victim's apartment complex, testified that on June 4, 2008, he received a call from a resident and went to the parking lot area between buildings twelve and fifteen in his complex, where he saw a red Jeep Cherokee parked. He approached the occupant and asked him why he was there, explaining that his presence there for an extended period of time had made one of the residents uncomfortable. Mr. Wamp testified that the individual inside the jeep informed him that he was there to meet a contractor to perform some work on some flooring. He testified that the individual's demeanor was friendly and calm during this conversation. Mr. Wamp testified that he left and called his maintenance supervisor, who informed him that no flooring work was being done at the complex that day. Mr. Wamp testified that he returned and informed the individual in the jeep that he was mistaken concerning the location of his supposed meeting and instructed him to leave. Mr. Wamp testified that the individual appeared briefly startled at his return, and he moved a small bag from his lap to the side. Mr. Wamp identified the defendant as the individual to whom he had spoken that day. Mr. Wamp testified that the victim approached him the following day, and after conversing with him, Mr. Wamp informed the complex's curtesy patrol officers to be on the lookout for the defendant and his vehicle.

Mr. Joseph Harris, one of the defendant's friends, testified that he worked with the defendant at a pest control company. He testified that the defendant owned a gun. He

testified that the defendant was unhappy about his breakup with Ms. Scott and wanted to be reunited with her. He testified that sometime after the breakup the defendant told him that he had slept with another girl. In addition, during a joint trip to Clarksville that occurred a month or two prior to the killings, the defendant told him that he had been having dreams concerning homicidal thoughts toward the victim.

Mr. Harris testified that on June 23, 2008, the defendant was not at work when he arrived. Sometime during the afternoon, the police came to the office looking for him. Mr. Harris testified that he went to the parking garage, called the defendant, and asked him what was going on. The defendant replied that he did not know. Afterward, the police told Mr. Harris not to call the defendant, but he informed them that he had already done so. He testified that after additional conversations with the police he called the defendant again and asked the defendant to turn himself in. He said the defendant told him that Ms. Scott was going to hate him for the rest of his life.

Mr. Harris testified that he visited the defendant in jail sometime later and had a conversation with him there. Over the defendant's objection, Mr. Harris testified that during this conversation the defendant told him that he believed that Mr. Harris might believe that he and Mr. Harris's wife were having an affair and that Mr. Harris was mad at him as a result. Mr. Harris testified that he informed the defendant that he did not believe any affair had occurred. He testified that he informed the defendant that he was mad because he was a father, the victim had been a father, and he did not believe that the defendant had thought through his choices. The defendant responded that he felt regret and claimed to have been "driving around like in a dream state" following the killing. Mr. Harris clarified that the defendant acknowledged killing the victim during this conversation. Mr. Harris also testified that the defendant had claimed that he had not "run to Mexico or something" following the killing because he needed to collect his wages from work and "didn't think the police would, you know, come get him that soon. . . ."

On cross-examination, Mr. Harris testified that the trip to Clarksville during which the defendant had discussed dreaming of homicidal thoughts toward the victim occurred prior to the defendant's hospitalization. Mr. Harris also testified that the defendant owned a gun because he had been "car jacked" in downtown Nashville over the past summer. Finally, Mr. Harris testified that during his jailhouse conversation with the defendant, the defendant had claimed that he was going to trial over the charges and that Mr. Harris "would be surprised when [he] learned the circumstances of the shooting." On redirect examination, Mr. Harris testified that the defendant carried his gun with him "[p]retty much all the time."

Ms. Julia Neilan, a crisis counselor at Mental Health Cooperative, testified that she performed an assessment of the defendant on June 5, 2008. She testified that following this

assessment she contacted the victim and warned him for his safety. On cross-examination, Ms. Neilan testified that the defendant was not in police custody and voluntarily sought her help on June 5.

Ms. Angie Alexander, a friend of the defendant since childhood, testified that the defendant spoke of Ms. Scott frequently following their break-up and that he often missed work. She testified that the defendant also spoke of the victim and knew where the victim worked. Ms. Alexander testified that shortly before his trip to the hospital, the defendant told her that he could kill the victim. She testified that upon hearing this she advised the defendant to go to the hospital. On cross-examination, Ms. Alexander testified that the defendant lost a considerable amount of weight and sleep following the break-up. She also testified that the defendant never again stated an intention to hurt the victim after he went to the hospital.

Finally, Detective Chad Gish of the Metropolitan Nashville Police Department, an expert in digital forensics, testified that he performed a forensic analysis on a seized computer and had prepared a report detailing his findings. This report was entered into evidence. Detective Gish testified that during his analysis he determined that the computer at issue was registered to the defendant and was running three minutes fast but otherwise accurately recording the date and time. He testified that the computer listed three users, "Brian," "Jessica," and "Jordan." He testified that he found nothing relevant to his investigation in the "Jordan" account. He testified that he was able to recover some internet search history for the "Jessica" account but also discovered nothing relevant to the investigation. He testified that this account was last used on May 11, 2008, at 4:20 p.m. He testified that he discovered a "smart keystroke reporter" in the computer's recycle bin, which was a shortcut to a program that logged all of the keystrokes made on computer.

Detective Gish testified that he was able to recover internet search history with respect to the "Brian" account, and he discovered several things of potential relevance to the case. On May 12, 2008, the user searched the term "Red Robin." On May 14, 2008, the user searched the terms "Red Robin Smyrna," "Red Robin management policies" and "Red Robin dating policies." On May 16, 2008, the user used whitepages.com to search for Dean Evans. On May 17, 2008, the user queried "guns for sale" on Craigslist and Google. The user also browsed several pages on a website called "Gunsofamerica" dealing with Taurus pistol revolvers. On June 4, 2008, the user performed a Google search of "poisons." Fifty seconds later, the user researched the same term on Wikipedia, as well as the term "cyanide poisoning." A short time later, the user performed a Google search of the terms "rattlesnakes for sale in Tennessee." Detective Gish also determined that the user searched on Yahoo: "What would happen if you injected air into a person's veins," and the user entered a similar query on Google a short time later. A few minutes later, the user searched for Dean Evans

of Nashville, Tennessee on a site called "peoplelookup.com." The user then "mapquested" directions to a specific address in Mount Juliet. Then the user went to Google and searched the phrase "live your life stealing all of my sunshine."

Over the defendant's objection, Detective Gish testified that on June 20, 2008, the user searched several phrases on Google, including "Missy needs," "Missy does," "Missy hates," "Missy eats," "Melissa dies," "Brian needs," "Brian does," and "Brian hates." Detective Gish testified that on June 22, 2008, the user "mapquested" directions from Brentwood, Tennessee, to Mount Juliet, Tennessee. Detective Gish testified that this search was deleted sometime later.

On cross-examination, Detective Gish testified that the internet history that he had discussed in his direct examination was only a small portion of the total internet history found on the computer. Detective Gish also testified that there was no guarantee that the defendant was the individual using the "Brian" user account. Detective Gish testified that the key logger had been sent to the recycle bin on March 21, 2007, but would still have been active on the computer because the recycle bin was never emptied.

Following this testimony, the State rested, and the defendant moved for a judgment of acquittal, which was denied. The defendant then took the stand in his own defense. The defendant testified that he was thirty years old and had been dating Ms. Jessica Scott since he was twenty. He testified that he was attracted to Ms. Scott immediately and fell in love with her quickly. He testified that their two families were intertwined, that they spent holidays together, and that they had many friends in common.

The defendant testified that he and Ms. Scott became engaged at one point but that their engagement came to an end because they "were young." He testified that they continued to see each other after the engagement ended, and the majority of the time their relationship was exclusive. He testified that they got engaged again in late June of 2006. He testified that Ms. Scott built a house while they were dating. He moved in with her when it was finished. The defendant testified that he was happy while he was living with Ms. Scott, he wanted to have children, and he was ready to move toward marriage. He testified that he felt secure and happy in his relationship with Ms. Scott.

The defendant testified that he moved out of the residence that he had shared with Ms, Scott in January of 2008. He testified that their engagement ended, but they both agreed to continue dating and to be exclusive with each other. He testified that although they were no longer engaged, his relationship with Ms. Scott remained "basically the same" except for the fact that they no longer lived together. He testified that he spent the night with Ms. Scott on a regular basis, and they still slept together two or three times per week. He testified that he

continued to share financial responsibility for the house and related expenses with Ms. Scott, and he continued to store a considerable amount of his personal belongings there. The defendant testified that moving out of the residence took a personal toll on him but that he set up goals for himself and tried to move the relationship back in a positive direction.

The defendant testified that on May 10, 2008, he went over to Ms. Scott's house. She informed him that she was on her way to work but instructed him to go ahead and "weed eat" her yard anyway. Ms. Scott briefly mentioned the idea of selling her house and moving to Gallatin. The defendant testified that in response he asked Ms. Scott if they needed to talk, and she informed him that they did. The defendant testified that "one of the first things she said was, you know, I think we ought to be able to see other people." The defendant asked Ms. Scott if she wanted to end the relationship, and Ms. Scott told him that she did not. The defendant testified that he started to panic. He asked Ms. Scott "who is he?" In response, Ms. Scott laughed and emphatically denied that she wanted to see anyone else. He testified that Ms. Scott did eventually admit that she had been out for drinks with a friend from work the night before, but she told him that there was no romantic interest or attraction there and that there had been no physical contact of any kind.

The defendant testified that Ms. Scott informed him that she was going to have drinks one more time with "this friend of hers" but claimed that it was nothing romantic. At the end of the conversation, the two of them agreed to continue seeing each other, and they saw each other the next day. The defendant testified that after May 10, he and Ms. Scott still saw each just as frequently, and he would often go over to her house to cut her grass or wash her car or change the oil. The defendant testified that Ms. Scott really liked receiving attention from him, and she enjoyed it when he would do things like give her a card or flowers.

The defendant testified that he eventually asked Ms. Scott if he could meet her "friend," but she told him "no, Dean wouldn't like that," which was how he first learned the victim's name. The defendant testified that Ms, Scott continued to deny that anything romantic or intimate was happening with the victim. However, the defendant began to get suspicious, and over time he became "100 percent totally consumed with who [Ms. Scott] was seeing" and whether she was being honest with him. He testified that he started losing his appetite, and he was not sleeping. He testified that he subsisted primarily on water, and he lost forty pounds over the next three weeks. He testified that everyone around him knew that he was not doing well.

The defendant testified that he began doing research on the victim right from the beginning. He testified that he was able to discover the victim's phone number because he and Ms. Scott shared a wireless plan, and he discovered the victim's full name and the

company he worked for through a simple computer search using his phone number. He testified that when he discovered that the victim was Ms. Scott's supervisor at work, he researched company policies on dating in an attempt to break them up. He testified that when he informed Ms. Scott of what he was doing, she became upset with him. However, she told him that she was not going to see the victim anymore.

The defendant testified that he first discovered that Ms. Scott was seeing the victim romantically just before Memorial Day weekend, when he went by her house while she was supposed to be at work. He went into the house to do some laundry and logged onto their computer, only to discover MapQuest directions to the Nashville zoo in an open Internet browser. He testified that he went to the zoo to see if she was telling him the truth, hoping that Ms. Scott would just be there with her sister. However, he testified that he discovered Ms. Scott sitting in an amphitheater with a man he had never seen before.

The defendant testified that his heart sank, and he started having major anxiety. He testified that he waited for the show that they were watching to finish, and while doing so, he saw the man touch Ms. Scott several times in an intimate and caring manner. The defendant testified that the two saw him after they left the amphitheater. The defendant testified that he did not want to cause "a situation" in front of the children and others in their group, so he said something to them about being sorry for being late to "family day at the zoo." The defendant testified that he hoped that the adults in the group would just "run with it," but Jessica's sister "blew up" at him instead. He testified that afterward, Ms. Scott came up to him and said that she was very embarrassed by the situation. She informed him that she was going to cancel their plans for Memorial Day weekend if he did not leave, so he left and waited in the zoo's parking lot. As he waited, he saw Ms. Scott and the victim leave the zoo hand-in-hand. As Ms. Scott got into her car, he saw them hug and kiss, and "it just all came crashing down" because "I knew she had been lying."

The defendant testified that he was devastated. He testified that he was "consumed with anger and rage and jealousy." He testified that he approached the victim in the parking lot as the victim was returning to his own vehicle and informed him that Ms. Scott was in a committed relationship. He testified that the victim told him that it was none of his business. He testified that he had dinner with Ms. Scott later that evening and they watched a video together at her house. He testified that he and Ms. Scott went on to spend Memorial Day weekend together with friends at a lake as planned.

The defendant testified that over the next several days Ms. Scott admitted that she was dating the victim. The defendant testified that he became confused by the way Ms. Scott was treating him. They began to argue about the victim all the time. The defendant testified that after the first week in June, Ms. Scott and the victim got more serious and that she began

staying over at the victim's house "pretty regularly." The defendant testified that many nights Ms. Scott would stay at the victim's house until 1:00 to 3:00 a.m., then returned home to her house where he would be waiting for her. She would then climb into bed and give him "a warm welcome."

The defendant testified that he continued to have difficulty sleeping, and when he did sleep, he would have dreams involving violence towards the victim. The defendant testified that he became suicidal, and he began researching ways to kill himself on the Internet. He also began researching gun purchases.

The defendant testified that on one occasion he went to the victim's place of employment in Mount Juliet. He went there intending to inform the victim that he was still seeing Ms. Scott because he had begun to suspect that Ms. Scott might be lying to the victim about their relationship. He testified that when he arrived, the victim came out of the restaurant with a "young attractive blonde headed girl" on his arm. The defendant testified that he saw the victim walk this girl to her car and give her a kiss. The defendant testified that he did not inform Ms. Scott of what he had seen because he did not believe that she would believe him. He decided he needed to gather proof.

The defendant testified that on June 5, 2008, he went over to the victim's apartment complex because he wanted to confront the victim and "just have it out with him, you know, and just confront this issue." The defendant testified that he sat in his Jeep in front of the victim's apartment complex and waited. He testified that he had homicidal thoughts. He testified that he was eventually approached by someone in a golf cart who asked him why he was there, and he told this individual a lie. He testified that the individual later asked him to leave, and he did so. He testified that afterward, he went to Centennial Hospital and checked himself in because he was having homicidal and suicidal thoughts. He testified that he was later released into the custody of the mental health cooperative, and he was ultimately taken to his mother's house by Ms. Scott.

The defendant testified that Ms. Scott began spending more time with the victim, although she was still willing to spend time with him as well. He testified that he and Ms. Scott were still sleeping together. The defendant testified that eventually, Ms. Scott told him that she and the victim had decided to be exclusive, and they agreed to be just friends. During this same conversation, the defendant mentioned the names of a couple of attractive female friends to Ms. Scott to gauge her reaction. The defendant testified that Ms. Scott "acted jealous when I mentioned to them." However, at the end of the conversation, they agreed to see other people and to no longer see each other.

The defendant testified that after this conversation he "hooked up with a friend"

named Missy. The defendant testified that he immediately regretted doing so, and he felt as though he was cheating on Ms. Scott. The defendant testified that when he informed Ms. Scott of what had transpired, she was very upset.

The defendant testified that on the day before the shooting he went over to Ms. Scott's house because they had agreed to go to church together. He testified that Ms. Scott was not there when he arrived, so he waited. When she finally returned, they had an emotional conversation, during which Ms. Scott was crying and kissing him. He testified that during their conversation Ms. Scott told him that she could not stop seeing the victim because the victim had been "nothing but nice" to her, and she did not know how she could possibly explain to the victim why she wanted to be with the defendant. The defendant testified that he finally left when Ms. Scott told him that she had to go work. He testified that when he returned home, he wrote out a draft letter to demonstrate to Ms. Scott how she could let the victim down without "seeming like a jerk."

The defendant testified that he saw Ms. Scott later that evening and that they discussed their relationship further. At one point, Ms. Scott became angry and asked him to leave. The defendant decided that he needed proof that the victim was "not the person that she thought that he was." The defendant testified that he drove his mother's car to the victim's residence in the early morning hours of June 23, 2008. The defendant testified that shortly after he arrived, he saw the victim leave his apartment in the company of the same woman that he had seen with him previously. The defendant testified that he saw the two of them hugging and kissing. The defendant testified that the victim saw him at one point, but he waited until the girl left before confronting him.

The defendant testified that he had gotten out of his car because he had hoped to discover some evidence of the woman's identity in the victim's vehicle. The victim approached him while he was in the parking lot near the victim's truck. The defendant testified that the victim asked him why he was there, and he responded by asking the defendant why the blonde girl had been there when the victim was supposed to be in a committed relationship with Ms. Scott. The victim informed him that Ms. Scott would not believe him about the blonde girl because he had been "doing crazy things" recently. In response, the defendant pretended to have taken an incriminating cell phone video of the encounter. The defendant testified that he was manipulating his cell phone when the victim lunged at him to take the phone and wrapped him in a chokehold.

The defendant testified that he attempted to hide his cell phone by placing it in the same pocket where he happened to be carrying his gun. The defendant testified that during their struggle, the victim reached into his pocket to retrieve the cell phone, but the victim pulled his gun out instead. The defendant testified that the gun went off right next to his

head. He testified that the gun also went off a second time during their struggle. He testified that he felt something wet on his back, lost his balance, and almost fell on his face.

The defendant testified that he turned around and discovered the victim pointing the gun at him. The defendant testified that he begged the victim not to shoot him, but the victim responded "You f'ing killed me." The defendant testified that he ran away, and the victim followed him. The defendant testified that he hid behind a porch at the back of the apartment building as the victim chased him and then lunged out at the victim as he passed. The defendant testified that the two of them wrestled around in a circle for control of the gun. Finally, he bit the victim, and the victim let go of the gun. The defendant testified that he told the victim to let go of him, but the victim refused. The defendant testified that he fired two or three shots and then ran away without checking on the victim. The defendant testified that he never intended to kill the victim because he knew that there was no way he could do so and still get Ms. Scott back.

The defendant testified that he was covered in blood. The defendant testified that he became afraid that he would be arrested after he returned to his vehicle, so he rolled down his window and threw the gun out while he was driving across a bridge. He testified that he tried to call his mother several times on the way home. The defendant testified that he drove around for a while and bought some Tylenol PM and some vodka. He testified that he started taking the pills because he did not want to live. He testified that he went to his mother's house and took additional pills. He testified that he remembered an ambulance picking him up some time later, but he did not remember going to the hospital.

On cross-examination, the defendant testified that although he believed that Ms. Scott was his soulmate, he was aware that Ms. Scott was not in love with him. The defendant denied that Ms. Scott had ever asked him to return the keys to her house. The defendant testified that he always carried a gun with him for protection, since he had been robbed and kidnapped at gunpoint. He testified that he usually carried this gun on his person, although sometimes it was in his car.

The defendant admitted that when he went to the victim's apartment complex on June 5, 2008, he was contemplating killing the victim. The defendant testified that he intended to stab the victim with two different knives and then take his wallet to make it appear that the victim had died during a robbery. The defendant testified that he had numerous items with him on that day to assist him in executing this plan.

The defendant acknowledged that he had been friends with "Missy" for a considerable period of time before becoming intimate with her, but he insisted that they only slept together one time. The defendant conceded that he referred to Missy as "baby" and had told her that

-20-

he loved her.  The defendant claimed that all of the searches that were performed on his computer concerning "Missy hates" and "Missy dies" were probably performed by Missy herself in an effort to discover song lyrics containing her name.

The defendant testified that on the day of the shooting, he had no intention of actually confronting the victim.  He testified that his intention was to discover the identity of the blonde girl that the victim was seeing on the side and put that girl in touch with Ms. Scott, or vice versa.  The defendant testified that he did not intentionally shoot the victim during their first struggle and that the only way the gun could have gone off was if the victim had pulled the trigger.  The defendant testified that the victim was incredibly strong during their second struggle in light of the wounds that he had suffered and was "fighting like he was on steroids."  The defendant testified that he shot the victim to make him let go of him and ran away afterward.

Following this testimony, the defense rested, and over the defendant's objection the State entered into evidence a brief portion of a recording made of a phone call from the victim to the police, in which the victim stated that he was "a little . . . concerned" about the situation that had developed with the defendant.  The State also recalled the victim's mother, who testified in rebuttal that her son was a kind, non-confrontational person.

After receiving this evidence, the parties gave closing arguments, and the jury was instructed.  Over the defendant's objection, the trial court provided the jury with an instruction concerning the destruction of evidence, which informed the jury that any attempt by an accused to conceal or destroy evidence could be considered as a relevant circumstance from which the guilt of the accused could be inferred.  The jury retired to deliberate and returned with a verdict finding the defendant guilty as charged.

The trial court imposed the mandatory sentence of life in prison.  The defendant filed a motion for new trial on June 25, 2010, which was denied following a hearing on July 28, 2010.  A notice of appeal was filed on July 26, 2011, raising challenges to the sufficiency of the convicting evidence and four additional points of error.  We proceed to address these claims.

**ANALYSIS**

The defendant claims that the evidence presented at trial was insufficient to support his conviction for premeditated murder.  The defendant also claims that the trial court erred by admitting three pieces of evidence: (1) a phone call made by the victim to the police several days prior to the crime; (2) testimony from Mr. Joe Harris concerning the defendant's erroneous belief that Mr. Harris believed that the defendant had slept with Mr. Harris' wife;

-21-

and (3) testimony from Detective Chad Gish concerning internet searches involving the name "Missy" that were conducted from the defendant's computer. Finally, the defendant claims that the trial court erred by granting the State's request for a special instruction regarding the concealment or destruction of evidence. For the reasons that follow, we reject each of the claims and affirm the judgment of the trial court.

## I.

The defendant claims that the evidence is insufficient to support his conviction. "When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Dorantes*, 331 S.W.3d 370, 379 (2011); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Moreover, "on appeal, the State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *Dorantes*, 331 S.W.3d at 379 (internal quotation omitted). A reviewing court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *State v. Carl J. Wagner*, No. M2010-00992-SC-R11-CD, 2012 Tenn. LEXIS 746, at *19 (Tenn. Oct. 12, 2012). "Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the conviction." *Id.* at *18.

This standard of appellate review applies to all convictions, regardless of whether they are based on direct or circumstantial evidence. *Dorantes*, 331 S.W.3d at 379-81. Even when a criminal offense has been proven exclusively through circumstantial evidence, the weight given that evidence, the inferences to be drawn from that evidence, and the extent to which all the circumstances are consistent with guilt are jury questions; under no circumstances may an appellate court "substitute its inferences for those drawn by the trier of fact," regardless of whether direct evidence exists or the State's case is wholly circumstantial. *Id.* at 379.

In the case before us, the defendant was convicted of first degree (premeditated) murder. "First degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2008). "Premeditation" means that the defendant formed the intent to kill: (1) "prior to the act itself" (although the defendant need not necessarily have held that intent "for any definite period of time" prior to the act), (2) "after the exercise of reflection and judgment," while (3) "sufficiently free from excitement and passion." T.C.A. § 39-13-202(d). "Premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment'. . . ." *State v. Leach*, 148 S.W.3d 42, 53 (Tenn. 2004) (quoting T.C.A. § 39-13-202(d)). A defendant's (1) "threats or declarations of intent to kill," (2) "preparations

-22-

to conceal the crime undertaken before the crime is committed," (3) "use of a deadly weapon upon an unarmed victim," and/or (4) "destruction or secretion of evidence of the killing," are just some of the many factors from which a reasonable jury may infer premeditation. *Id.* at 53-54.

'Self-defense" is a defense against prosecution for murder. Tennessee Code Annotated section 39-11-601(b)(1) provides that:

> [A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

T.C.A. § 39-11-611(b)(1). Deadly force may even be used in self-defense if certain conditions are met, such as "[t]he person has a reasonable belief that there is an imminent danger of death or serious bodily injury." *See* T.C.A. § 39-11-611(b)(2). If a defendant raises facts sufficient to support a finding of self-defense, "[t]he [S]tate has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense." *State v. Belser*, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996). Whether or not a defendant acted in self-defense is a question of fact for the jury. *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994).

After reviewing the entire record with these standards in mind, we conclude that the evidence adduced by the State was sufficient to support the defendant's conviction for premeditated first degree murder. Although the defendant testified that the victim's initial wounds on the morning in question were self-inflicted, he acknowledged on the stand that he shot the victim several times at the conclusion of their second struggle. Moreover, it was the jury's prerogative as to whether to believe the defendant's testimony that the initial wounds were self-inflicted. Additionally, the medical examiner opined that one of the latter gunshot wounds standing alone would certainly have been fatal to the victim. This testimony combined is sufficient to establish that the defendant intentionally killed the victim.

There was also sufficient evidence adduced at trial to support the jury's conclusion that the defendant killed the victim in a premeditated fashion. The defendant himself testified that he contemplated killing the victim on several occasions, including at various points throughout the day on June 5, 2008. Although the defendant further testified that he had abandoned this homicidal intent by the morning of the shooting, the jury was free to discredit this portion of his testimony.

In addition, the State presented sufficient evidence to establish several factors from which the jury could reasonably infer premeditation. Ms. Scott, Mr. Harris, and Ms. Alexander each testified that the defendant had made prior declarations of his intention to kill the victim. The defendant himself testified that he used a deadly weapon against an unarmed victim and that he concealed or destroyed evidence, including a bloody shirt and the murder weapon, following the shooting. There was also evidence presented at trial from which a reasonable jury could have concluded that the defendant had made prior preparations to conceal his role in the killing. The defendant testified that he drove his mother's car—rather than his own—to the scene of the shooting and that he parked it some distance away from the victim's residence. Ms. Snowdon testified that she did not hear a car fleeing the scene following the shooting. From this, a jury could reasonably conclude that the defendant intentionally took a strange vehicle to the area, and parked it in a remote location, for purposes of increasing the likelihood of a successful getaway following the shooting. Evidence concerning each of these four factors is relevant to the issue of premeditation. The existence of evidence sufficient to support a finding that all four of these factors were satisfied, especially when combined with the defendant's own admission on the stand that he had prior homicidal thoughts concerning the victim on numerous occasions, fully suffices to support the jury's conclusion that the defendant was guilty of premeditated first degree murder.

The defendant also asserts that the State never produced evidence sufficient to defeat his claim of self-defense. In this regard, the defendant urges that all of the evidence presented by the State was consistent with his claim that the victim was shot during the course of a mutual struggle for possession of his firearm. The defendant places particular emphasis on the testimony of Ms. Snowdon to the effect that she heard two voices arguing loudly before the shots were fired. The defendant also directs our attention to the testimony of Detective Corcoran (describing evidence that a struggle occurred in the parking lot of the victim's complex) and to the combined testimony of Dr. Deering and Mr. Dunlop (to the effect that the defendant bit the victim on the arm while the victim was still alive).

However, the defendant's version of events was not entirely consistent with the evidence presented at trial. For example, the defendant's testimony conflicts with Dr. Deering's testimony that some of the shots that the victim received came from behind. It is also inconsistent with the testimony of various police officers to the effect that the blood trail that they discovered on the morning in question meandered back and forth (as likely would be created by a wounded individual fleeing from someone with a gun) rather than remaining roughly straight (as likely would be created by a wounded individual who now possessed a gun and was pursuing his former attacker). The defendant also claimed that the victim, after gaining possession of the gun, spoke to him numerous times in a threatening manner—a sequence of events that would appear extremely improbable in light Dr. Deering's testimony

that the victim had been shot and severely wounded in the jaw—a wound which, in his professional opinion, occurred in the parking lot and well prior to the fatal shot (which was inflicted behind the victim's apartment building). The defendant also testified that his gun was a semi-automatic (a type which ejects a shell casings after each shot) and that he fled the scene immediately after the last shot was fired without so much as a backward glance at the victim—yet multiple law enforcement witnesses testified that no shell casings were found at the crime scene. These and other discrepancies between the defendant's testimony and the remaining evidence would fully support and explain the jury's decision to reject the defendant's claim of self-defense.

More importantly, even had the defendant's version of events been entirely consistent with the remaining evidence, a reasonable jury would still have been free to discredit his testimony. A reasonable jury could have concluded on these facts that the seeming consistency between the defendant's testimony and the remaining evidence was the natural result of a decision by the defendant to tailor his testimony to account for all of the evidence that he had just heard and seen during the State's case-in-chief. Discrediting the defendant's testimony and crediting the testimony of the witnesses for the State, a reasonable jury could certainly have concluded that the defendant's act of shooting an unarmed man four times in the head and neck (sometimes from behind)—in multiple locations and from multiple distances, over a period of several minutes—was not a lawful exercise of the right to self-defense that the law afforded him.

In the alternative, the defendant argues that the State failed to prove that he did not act in the heat of passion and upon adequate provocation when he committed the offense, thus reducing the severity of his crime from first degree murder to manslaughter. "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211.

There is evidence in the record that would have supported the defendant's conviction of this lesser offense. However, the defendant's jury did not do so. It was for the jury to decide whether the defendant acted under adequate provocation, and the jury was under no obligation to accept the defendant's contention that the killing was committed in a state of passion. *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995) (presence of extreme passion and adequate provocation are jury questions). This court will not revisit the jury's decision in this regard. As we have discussed, there is ample evidence in the record from which a jury could conclude that the defendant killed the victim in a premeditated fashion. This same evidence generally supports the jury's conclusion that this defendant was no longer acting under the influence of extreme passion when he killed the victim. The defendant's claim that the evidence is insufficient to support his conviction for premeditated

first degree murder is denied.

## II.

The defendant claims that the trial court erred by admitting three pieces of evidence: an excerpt of a recording of a phone call made by the victim to the police prior to the shooting, testimony by the State's computer forensic expert that various searches involving the name "Missy" were performed on the defendant's computer, and testimony from Mr. Harris referencing a possible affair between the defendant and the witness's wife. After review, we conclude that all three pieces of evidence were properly admitted.

As a general rule, all relevant evidence is generally admissible unless a particular constitutional provision, statute, or rule excludes it. Tenn. R. Evid. 402. "Evidence which is not relevant is not admissible." *Id.* Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Decisions concerning the admissibility of evidence at trial are entrusted to the discretion of the trial court. *See State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). A trial court does not abuse its discretion unless it applies an incorrect legal standard or reaches an illogical decision that causes an injustice to the complaining party. *See id.* Under these standards, the defendant has failed to establish that the trial court abused its discretion by admitting any of the evidence at issue.

## A.

The defendant's first evidentiary claim is that the trial court erred by admitting a brief portion of a phone call made by the victim to the police several days prior to the crime. The excerpt at issue is less than ten seconds long in its entirety, and in it the victim can be heard stating: "But I mean, once I got here, and the manager of my apartment complex told me what had happened—well, now I'm a bit more concerned." The State had initially sought to introduce the recording of the victim's entire phone call, but when the defendant objected on hearsay grounds, the trial court admitted only the excerpt quoted above, on the grounds that this portion of the tape reflected the declarant's then-existing mental and emotional condition.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid.

801. "Hearsay is not admissible except as provided by" the rules of evidence or other applicable law. Tenn. R. Evid. 802. One exception to the general prohibition against hearsay is "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health). . . ." Tenn. R. Evid. 803(3). We agree with the trial court that the statement at issue, in which the victim discussed feeling "more concerned," fits within this exception.

The defendant also argues on appeal that the State's use of the tape constituted improper rebuttal. However, "[a]ny competent evidence which explains or directly applies to evidence introduced by the accused is admissible in rebuttal." *State v. Ramos*, 331 S.W.3d 408, 417 (Tenn. Crim. App. 2010). Decisions concerning the admissibility of evidence and permissible scope of State's rebuttal lie within the sound discretion of the trial judge. *State v. Reid*, 213 S.W.3d 792, 831 (Tenn. 2006). We discern no abuse of that discretion in this case.

The defendant asserts that he never advanced the proposition that the tape was intended to rebut, and he agues that a party cannot rebut a proposition that has not been advanced. The defendant argues that he never claimed that the victim "was unconcerned or that he behaved in an unconcerned manner." However, the defendant testified that the victim initiated the confrontation in the parking lot on the day of the shooting. While he did not directly state that the victim was "unconcerned," the issue of the victim's emotional state and his propensity toward aggressive behavior was fairly raised by the defendant's testimony.

The defendant also claims that the redacted recording was cumulative with the evidence presented in the State's case-in-chief. However, contrary to the defendant's claim, we can find in the record little to no prior testimony concerning the victim's mental and emotional state in the weeks preceding the shooting. The State apparently did not know that the defendant was going to claim that the victim was the aggressor on the date in question until after the defendant took the stand. "The state is given the right of rebuttal because it does not and cannot know what evidence the defense will use until it is presented at trial." *State v. Thompson*, 43 S.W.3d 516, 524 (Tenn. Crim. App. 2000). Presenting evidence that would cast doubt on the defendant's claim that the victim had sought out a confrontation with him on the morning in question was within the proper scope of rebuttal and was not cumulative with evidence that had already been presented.

Finally, the defendant claims that the admission of the audio tape violated his rights under the Confrontation Clauses of the United States and Tennessee Constitutions. *See* U.S. CONST. amend. VI. ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."); TENN. CONST. art. I, §9 ("[I]n all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face. . . ."). These

provisions have been interpreted as barring the admission of out-of-court statements that are testimonial in nature, except in limited circumstances. *See Crawford v. Washington*, 541 U.S. 36, 68 (2004) ("Where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability [of the witness] and a prior opportunity for cross-examination."); *State v. Maclin*, 183 S.W.3d 335, 354 (Tenn. 2006) ("If [an out-of-court statement] is determined to be 'testimonial,' then . . . the statement is inadmissible unless the witness was unavailable and the defendant had a prior opportunity for cross-examination."). Whether a given statement is testimonial in nature is determined on a case-by-case basis. *Maclin*, 183 S.W.3d at 354 ("We adopt a case-by-case approach to decide whether a proffered hearsay statement is 'testimonial. . . .'"). The term "testimonial" covers "at a minimum . . . prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations." *Crawford*, 541 U.S. at 68. "Statements are non-testimonial when made in the course of police interrogation under ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 828 (2006).

Although the defendant objected to the admission of the redacted recording on hearsay grounds and on grounds that it constituted improper rebuttal, the defendant did not raise any Confrontation Clause concerns during a fairly lengthy jury-out hearing on the subject. Neither the parties nor the trial court appear to have considered the constitutional ramifications of admitting the recording. Consequently, we find that the defendant waived his Confrontation Clause claim by virtue of his failure to take any and all reasonable steps to prevent or mitigate any possible constitutional error stemming from the recording's admission. *See* Tenn. R. App. P. 36(b) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). *See also* Tenn. R. Evidence 103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless ... a timely objection ... appears of record ... stating the specific ground of objection if the specific ground was not apparent from the context ....").

Notwithstanding the defendant's failure to bring this issue to the trial court's attention, this court has the authority to review the defendant's claim under the "plain error" standard. *See State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) ("Rule of Appellate Procedure 36(b), Rule of Evidence 103(d), and Rule of Criminal Procedure 52(b) allow this Court to take notice of 'plain errors' that were not raised in the proceedings below."). This court will only grant relief under the "plain error" standard if the claim involves an error that probably changed the outcome of the trial, and five additional factors are satisfied: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice." *Id.* (internal quotations omitted).

After listening to the recording at issue and reviewing the entire record, we conclude that the trial court's decision to admit the excerpt of the victim's phone call to police did not have any significant impact on the outcome of the trial. Playing the recording took up less that ten seconds of a four-day trial. The excerpt itself was not particularly emotional or memorable. Nor was it dispositive of any of the major issues presented in the case. While the victim's recorded statement that he was "a little more concerned" about the defendant's activities in the weeks prior to the trial reflected a mindset that was somewhat inconsistent with the defendant's claim that the victim initiated the later confrontation, it does not appear likely to have been the decisive factor on which the jury based its decision in light of the voluminous evidence presented by the prosecution in its case-in-chief.

In addition, we are not convinced that several of the other factors necessary for relief under the plain error standard are present. No clear and unequivocal rule of law has been breached. Deciding whether or not the tape at issue constitutes testimonial evidence requires this court to consider factors such as "whether contact was initiated by the declarant or law enforcement officers," "whether the statement was given in response to questioning," "the declarant's purpose in making the statements," and "whether an objective declarant under the circumstances would believe that the statements would be used at trial." *Maclin*, 183 S.W.3d at 349. Because the defendant did not raise the Confrontation Clause issue at trial, the record before us provides no insight whatsoever with respect to any of these issues. The excerpt may well have been properly admitted as non-testimonial evidence. The admission of audio recordings of many 911 calls have been upheld against Confrontation Clauses challenges on such grounds, including one admitted by the United States Supreme Court in *Davis*. Nor on this record is it entirely clear to us consideration of any possible error is necessary to do substantial justice.

Because the defendant failed to object to the admission of the excerpt of the victim's phone call to police on Confrontation Clause grounds, no clear rule of law was breached, and the admission of the excerpt did not probably change the outcome of the trial, the defendant is entitled to no relief on this issue. The defendant's claim that the trial court erred by admitting a portion of a telephone call made by the victim to the police is denied.

**B.**

Next, the defendant claims that the trial court erred by permitting the State to elicit testimony from Mr. Harris concerning a possible affair between the defendant and the witness's ex-wife. More specifically, in the course of testifying concerning his jailhouse meeting with the defendant, Mr. Harris testified that at one point the conversation turned toward his attitude concerning the defendant. Over the defendant's objection, Mr. Harris testified that this topic came up "[b]ecause [the defendant] thought that I thought that him

-29-

and my wife, or ex-wife now were having an affair." Mr. Harris went on to testify that he never thought that any such affair had occurred and that he had explained to the defendant that he was angry at him because the victim had been a father. Mr. Harris testified that the defendant acknowledged killing the victim shortly afterward. The defendant claims that witnesses' references to (1) the fact that the victim was a father and (2) the defendant's mistaken belief concerning a possible affair were both "irrelevant and inflammatory."

The defendant argues that this testimony was irrelevant because it had no tendency to make any material issue in the case more or less likely. The defendant also argues that the probative value of the statements was substantially outweighed by their potential for prejudice, explaining that the testimony concerning the possible affair might have been viewed by the jury as reflecting negatively on the defendant's character, and the testimony concerning the witnesses' empathy with the victim because they were both fathers might have inflamed the passions of the jury and led them to convict the defendant on an improper basis.

However, we agree with the trial court that the testimony at issue was relevant in the sense of providing important context for the defendant's subsequent admission that he had killed the victim. "Background evidence" that does not directly bear upon a material issue may nonetheless be admissible if such evidence will aid in the understanding the other material evidence adduced at trial or its absence "could have detrimental effects on the jury's comprehension of the offense in question." *State v. Gilliland*, 22 S.W.3d 266, 271-272 (Tenn. 2000). Absent the testimony at issue, the jury would have had no way to reconcile Mr. Harris's testimony concerning the defendant's initial denial of any involvement in the victim's death and his subsequent admission of responsibility.

Nor do we believe, after reviewing the record, that the statements at issue were unduly prejudicial. By the time the testimony in question was elicited, the jury had already heard without objection far more emotional testimony concerning the fact that the victim was a father from the victim's mother and allegations that the defendant had slept with other women other than Ms. Scott. Any marginal additional prejudice posed by Mr. Harris's testimony on these subjects would appear to have been minimal. Mr. Harris himself testified that he did not believe that any affair had occurred, and the defendant himself admitted to sleeping with another woman. Under these circumstances, we do not believe there is any realistic possibility that the defendant's jury convicted him of first degree murder because it suspected him of possible adultery.

## C.

Finally, the defendant claims that the trial court erred by allowing Detective Chad

Gish to testify concerning internet searches involving the name "Missy" that were made from the defendant's computer. Specifically, the defendant complains that Detective Gish was permitted to testified that on June 20, 2008, a series of Google searches were made on the defendant's computer between 4:16 and 4:44 a.m. including the phrases "Missy needs," "Missy looks like," "Missy does," "Missy hates," "Missy goes," "Missy died," and "Missy dies." The defendant again claims that this testimony was not relevant and was unduly prejudicial.

However, the defendant was charged with first degree murder and the State bore the burden of establishing that this level of culpability, rather than some lesser level, applied to the crime at issue. The existence of these searches had a tendency to show that the defendant was involved, at least emotionally, with another woman, and he had either performed these searches himself due to his interest in her or had become so close to her that he would allow her to perform them herself on his computer in the early hours of the morning. The defendant's level of emotional involvement with a third party was at least potentially relevant to a jury's determination of whether the defendant was acting under the influence of extreme passion on the day that he committed the crime. In addition, to the extent that a jury might conclude that the defendant himself performed the searches, search terms involving death and dying might be relevant to the jury's determination of whether the defendant was having homicidal thoughts and meditating on the idea of killing someone.

Nor do we believe that Detective Gish's testimony concerning these searches was unduly prejudicial. As discussed above, other witnesses had previously testified, without objection from the defendant, that the defendant was seeing or had seen women other than Ms. Scott. The marginal prejudice posed by this additional evidence on the subject appears minimal.

For the reasons we have discussed, the defendant's claims that the trial court erred by admitting various pieces of evidence are denied. Because we conclude that the trial court did not err by admitting any of the evidence at issue, we need not address the defendant's claim that the cumulative effect of the evidentiary errors committed by the trial court deprived the defendant of a fair trial. *See State v. Zimmerman*, 823 S.W.2d 220, 228 (Tenn. Crim. App. 1991) (holding that the "cumulative effect" of individually harmless errors may act to deprive the defendant of a fair trial).

### III.

The defendant claims that the trial court erred by granting the State's request for a special jury instruction. "It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will

be submitted to the jury on proper instructions." *Dorantes*, 331 S.W.3d at 390. A "trial judge has the duty to give a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998); *see also State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). "The proper function of a special instruction is to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury." *State v. Cozart*, 54 S.W.3d 242, 245 (Tenn. 2001). "In determining whether instructions are erroneous, th[e] Court must review the charge in its entirety and read it as a whole." *Leach*, 148 S.W.3d at 58. "The misstatement of an element in jury instructions is subject to constitutional harmless error analysis." *State v. Faulkner*, 154 S.W.3d 48 (Tenn. 2005). "A charge should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998).

The charge in question stated in its entirety:

Any attempt by an accused to conceal or destroy evidence is relevant as a circumstance from which guilt of the accused may be inferred. The Court has charged the jury concerning an inference that the jury may make in regard to certain evidence in this case. However, the jury is not required to make this inference. It is the exclusive province of the jury to determine whether the facts and circumstances shown by all the evidence in this case warrant the inference which the law permits the jury to draw. The inference may be rebutted by direct or circumstantial evidence or both, whether it exists in the evidence of the State or is offered by the defendant. The State must prove beyond a reasonable doubt every element of the offense before the defendant can be found guilty.

The defendant claims that this instruction " failed to adequately clarify that the inference of guilt extended to all of the lesser-included offenses and was not associated solely with the indicted offense." The defendant asserts that this deficiency is significant because the Tennessee Supreme Court has cautioned that the post-crime concealment of evidence is not proof of premeditation, citing *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992). The defendant explains that "given the confusion that may arise from the fact that concealment can generally indicate guilt, but cannot establish the element of premeditation, the defendant contends that when the inference instruction is provided in a first degree murder prosecution, special consideration should be made to ensure that the instruction does not mislead the jury as to the applicable law."

However, we note that the *West* court itself, immediately after holding that a

-32-

defendant's post-crime concealment of a weapon provided insufficient evidence of premeditation, upheld the trial court's use of a jury instruction broader than the one at issue in this case. The instruction at issue in *West* stated simply that "any attempt to suppress, destroy, or conceal evidence is relevant as a circumstance from which guilt of an accused so acting, may be inferred." *West*, 844 S.W.2d at 150. If the giving of such an instruction concerning the concealment or destruction of evidence was potentially unconstitutionally confusing in light of the court's holding with respect to premeditation in first degree murder cases, we believe that the *West* court would have commented on this fact. Instead, the *West* court explained:

> Although we have previously stated in this opinion that the concealment of evidence is not an indication of premeditation or deliberation, it is equally clear that the concealment of evidence may be relevant to guilt. For example, in this case the concealment of evidence contradicts defendant's self-defense story by illustrating his fear of detection. Thus, this instruction was properly given.

*Id.* at 150.

In any event, we do not believe that the trial court's instructions, read as a whole, were likely to confuse the jury. The trial court's special instruction was carefully worded, reminding the jury that it was not *required* to infer guilt from the acts at issue and that notwithstanding the inference the burden of proof remained on the prosecution with respect to every element of the crime charged. The trial court also properly instructed the jury that the defendant was presumed innocent and that it was the prosecution's duty to prove his guilt beyond a reasonable doubt. The trial court gave the jury clear instructions concerning the issue of premeditation. Taken together, we believe that the instructions at issue fairly submitted the legal issues and informed the jury of the applicable law. The defendant's claim that the trial court erred by granting the State's request for a special instruction concerning the concealment or destruction of evidence is denied.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE

-33-